**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CHAPARRAL TEXAS, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2468 |
| | § | |
| W. DALE MORRIS, INC., *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This opinion addresses the second of two disputes arising out of a contract to purchase oil and gas wells, leases, and properties located in Texas.  The plaintiff, Chaparral Texas, L.P., was the purchaser; the defendants, W. Dale Morris, Inc. ("WDMI") and Paul R. Galloway, Jr., were the sellers.  The first dispute, addressed in an earlier memorandum and opinion, concerned Chaparral's breach of contract claim that a saltwater disposal well included in the sale was completed in violation of a Texas Railroad Commission permit.  Chaparral sought approximately $150,000 in damages for the alleged contract breach.  The seller-defendants moved for partial summary judgment that the well's condition did not breach the contract.  That motion was granted.  (Docket Entry No. 25).

This second dispute concerns which party is responsible for certain post-closing adjustments to the purchase price.  In the complaint, Chaparral alleged that it was entitled to recover approximately $12,000 in post-closing price adjustments and alleged that WDMI's and Galloway's refusal to pay breached the contract.  WDMI and Galloway counterclaimed

seeking $16,710 in reimbursement for amounts spent on pre-closing clean-up work on the property sold.  The parties cross-moved for summary judgment on whether Chaparral was owed for post-closing price adjustments and whether the seller–defendants were entitled to reimbursement for the clean-up costs they had paid.  (Docket Entry Nos. 32, 33).  Both parties filed responses, (Docket Entry Nos. 34, 35), and Chaparral filed a reply to WDMI's and Galloway's response, (Docket Entry No. 36).

In the summary judgment briefing, WDMI and Galloway agreed that they owed Chaparral approximately $10,000 under the contract's post-closing price adjustment provision.  (Docket Entry No. 32 at 4; *id.*, Ex. D).[1]  (Docket Entry No. 33 at 4).  WDMI and Galloway sought summary judgment on their claim that under the contract, Chaparral was required to reimburse WDMI and Galloway for $16,710 they spent in pre-closing clean-up costs, less the approximately $10,000 they conceded they owe Chaparral in post-closing price adjustments.  (Docket Entry No. 32 at 2, 4-5).  Chaparral sought summary judgment that it is entitled to the $10,709.85 with no offsetting obligation to reimburse WDMI and Galloway for pre-closing clean-up costs.  Chaparral asserted that it is entitled to prejudgment interest on the amount due and to over $61,000 in attorneys' fees incurred in suing for the post-closing price adjustments.  The parties dispute whether, even if Chaparral prevails in its

---

[1]Chaparral claimed that it was owed $11,778.67 in post-closing adjustments, but in its summary judgment motion sought only $10,709.85. Chaparral did not include $1,068.82 in environmental clean-up costs that it paid, because Chaparral argued had that the parties' contract prohibited post-closing adjustments for environmental clean-up costs.  (Docket Entry No. 33 at 4 n.5).  This appears to account for the difference between the amount Chaparral originally stated in the complaint in this suit and the amount that it sought in its summary judgment motion.

2

breach of contract claim for WDMI's and Galloway's failure to pay $10,709.85 in post-closing adjustments, Chaparral is entitled to recover this amount.

Based on the pleadings, the motions, responses, and reply, the parties' submissions, and the applicable law, this court denies both summary judgment motions.  There are fact issues as to whether Chaparral is liable to reimburse WDMI and Galloway for the pre-closing clean-up costs as a post-closing price adjustment.  Even if Chaparral prevails on its claim that it is entitled to recover $10,709.85 with no offsetting obligation to reimburse WDMI and Galloway for pre-closing clean-up costs as a post-closing price adjustment, because Chaparral was unsuccessful on its damages claim relating to the saltwater disposal well, it may only recover reasonable fees attributable to the claim on which it prevailed.

The reasons for this ruling are explained in detail below.

I.      **Background**

A.      **The Parties' Contract**

The parties entered into a Purchase and Sale Agreement ("PSA") under which Chaparral acquired from WDMI and Galloway oil and gas wells, leases, and other property – referred to collectively in the PSA as the "Interests" –  located in Texas.  The PSA had an effective date of June 1, 2004, was signed on July 27, 2004, and closed on August 4, 2004. (Docket Entry No. 32, Ex. A at 1, 2, 13).  For the period between the effective date and the closing date, the PSA required WDMI and Galloway to "operate [their] business in the ordinary course" and to obtain Chaparral's prior written consent before "commit[ting] to any

3

operation, or services of related operations" or making "any capital expenditures" that exceeded $5,000.  (*Id.* at 7).

The PSA provided that the $2,029,458.00 purchase price would be adjusted for certain expenses incurred and revenues received while the transaction was being completed.  The purchase price would be increased by:

> (1) The value of all oil and gas in storage or pipelines at the Effective Time above the pipeline connection or upstream of the sales meter which is credited to the Interests, such value to be the market value or, if applicable, the contract price in effect as of the Effective Time, less taxes and deductions by the purchaser;
> (2) The amount of all verifiable expenditures under applicable operating agreements or other similar arrangements or agreements and, in the absence of such agreements, such expenses of the sort customarily billed thereunder, paid by Seller in connection with the Interests for the period subsequent to the Effective Time;
> (3) An amount equal to all prepaid expenses attributable to the Interests that are paid by Seller or any affiliate of Seller prior to the Closing Date . . . that inure to the benefit of Buyer and that are, in accordance with generally accepted accounting principles, attributable to the period after the Effective Time, including without limitation, prepaid ad valorem, property, production, severance and similar taxes (but not including income taxes) based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom;
> (4) Any other amount agreed upon by Seller and Buyer.

(Docket Entry No. 32, Ex. A at 2-3).  The purchase price would be decreased by:

> (1) The value of proceeds received by Seller from the sale of oil, gas or other hydrocarbons attributable to the Interests and relating to production after the Effective Time, less all applicable taxes not reimbursed to Seller by a purchaser;
> (2) An amount equal to Seller's pro rata share of any unpaid ad valorem, property, production, severance and similar taxes and assessments (but not including income taxes) based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom accruing to the Interests prior to the Effective Time;

4

(3) The amount of all verifiable expenditures paid by Buyer for work actually done and performed in connection with the Interests for the period prior to the Effective Time;

(4) Any other amount agreed upon by Seller and Buyer;

(5) The amount of the deposit.

(*Id.*).

The PSA also stated that "no purchase price adjustments shall be made for Environmental Defects."  The PSA defined "Environmental Defect" as "any material environmental defect relating to the Interests in the nature of environmental pollution or contamination, including pollution of the soil, ground water or the air; underground injection activities and waste disposal on site or offsite; failure to comply with applicable land use, surface disturbance, licensing or notification requirements; or violations of environmental or land use rules, regulations, demands or orders of appropriate state or federal regulatory agencies." (Docket Entry No. 32, Ex. A at 10-11).

Under the PSA, Chaparral had the right to inspect the property for "Environmental Defects" before the closing date.  Chaparral was required to give WDMI and Galloway notice of any such defects no later than two days before the closing date.  The PSA required that this notice be in writing, include a description of the "Environmental Defects," and state the "Environmental Defect Amount," defined as "the cost to remediate such Environmental Defect in accordance with applicable environmental laws." (*Id.*).  The PSA did not require WDMI and Galloway to cure any "Environmental Defects" Chaparral identified.  It stated that either Chaparral or WDMI and Galloway could terminate the Agreement if "the Environmental Defects which Buyer timely asserts exceeds $1.00." The PSA also stated that

5

Chaparral "shall be deemed to have waived all Environmental Defects" for which timely notice was not given.  (*Id.*).

The PSA stated that it "constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions and prior agreements and understandings relating to such subject matter.   No material representation, warranty, covenant, agreement, promise, inducement or statement, whether oral or written, has been made by Seller or Buyer and relied upon be the other that is not set forth in this agreement or in the instruments referred to herein, and neither Seller nor Buyer shall be bound or liable for any alleged representation, warranty, covenant, agreement, promise, inducement or statement not so set forth."  (Docket Entry No. 32, Ex. A at 18).  The PSA provided that its terms "may not be altered or amended, nor any rights hereunder be waived, except by an instrument in writing, executed by the party or parties to be charged with such amendment or waiver.  No waiver of any term, provision, or condition of this agreement, in any one or more instances, shall be deemed to be, or construed as, further or continuing waiver of any other term, provision or condition to this Agreement."  (*Id.*, Ex. A at 17).

The PSA included a choice-of-law provision specifying Texas law.  (Docket Entry No. 32, Ex. A at 18).

## B.    The Post-Closing Price Adjustment Claims

Before signing the PSA, Chaparral inspected the property.  After the inspection, Chaparral met with WDMI and Galloway and gave them a written list of environmental

6

problems.  (Docket Entry No. 33, Ex. B at 23-27, 42-43).  Chaparral told WDMI and Galloway that these concerns had to be remedied before Chaparral would purchase the property.  Chaparral had received a $200,000 bid for the clean-up work.  (*Id.*, Ex. B at 43; Ex. C at 30-31).  WDMI and Galloway refused to reduce the sale price by $200,000 and told Chaparral that they could do the clean-up work for significantly less.  The parties agreed that WDMI and Galloway would arrange the clean-up and that the sale price would not be reduced by $200,000.  (*Id.*, Ex. B at 44).

WDMI and Galloway paid $16,710.96 for clean-up work on the property.  The work was performed after the PSA's effective date but before the closing date.  (Docket Entry No. 32, Exs. A, C, D).  The work included cleaning up oil and salt water, washing tanks and well heads, replacing "old dirt," and placing absorbing material such as peat moss on the ground. (Docket Entry No. 32 at 7; *Id.*, Ex. C; Docket Entry No. 33, Ex. B at 47-51, 80-81).

After Chaparral filed suit and the parties had conducted discovery and filed their dispositive motions, WDMI and Galloway agreed that they owe Chaparral approximately $10,000 in post-closing price adjustments.  WDMI and Galloway argued that this amount was more than offset by Chaparral's obligation to reimburse them for the $16,710.96 they spent on clean-up costs.

## II.    The Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The movant

bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim. *Celotex*, 477 U.S. at 330. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary  judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some

metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.    Contract Interpretation

What a contract means, and whether a contract is ambiguous, are questions of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). A court should construe an unambiguous contract according to the plain meaning of its express wording. *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985). Unambiguous contracts are enforced as written. *Heritage*, 939 S.W.2d at 121.

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when

the parties entered the contract.   *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).   Parol evidence is not admissible for the purpose of creating an ambiguity. *See Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951); *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (1941).   If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain the true meaning of the instrument.   *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).   The meaning of an ambiguous contract is a question of fact.   *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980).

## III.   Analysis

Chaparral seeks summary judgment that it need not reimburse the sellers on the basis of the PSA provision that "no purchase price adjustments shall be made for Environmental Defects."   (Docket Entry No. 32, Ex. A at 11).   Chaparral argues that this language "***specifically prohibits*** either party from recovering pre-closing environmental cleanup costs as post-closing adjustments."   (Docket Entry No. 35 at 1-2).   WDMI and Galloway argue that Chaparral cannot invoke this provision because Chaparral failed to give the proper notice of Environmental Defects.   WDMI and Galloway also argue that the costs they paid were not to remediate "Environmental Defects" as that term is defined in the parties' contract.

The PSA required Chaparral to provide timely notice to terminate the Agreement prior to closing because of the presence of an Environmental Defect.   (Docket Entry No. 32, Ex. A at 11).   The consequence of a failure to provide timely notice is a waiver of the right to terminate the Agreement due to the presence of Environmental Defects, not a waiver of the

right to invoke a ban on price adjustments for Environmental Defects.  Moreover, the record shows that Chaparral did give notice, in writing, of the environmental problems it identified. Morris testified at his deposition that at a July 14, 2004 meeting, Chaparral delivered a written list of environmental problems that it found during the inspection and an estimate of the costs to address them.  (Docket Entry No. 36, Ex. A, at 27, 34).

WDMI and Galloway also argue that the clean-up costs were not incurred to remedy "Environmental Defects" as defined in the PSA.  WDMI and Galloway argue that the pollution or contamination identified must violate environmental laws or regulations to be an "Environmental Defect."  The PSA defines an "Environmental Defect" as "any material environmental defect relating to the Interests in the nature of environmental pollution or contamination, including pollution of the soil, ground water or the air; underground injection activities and waste disposal on site of offsite; failure to comply with applicable land use, surface disturbance, licensing or notification requirements; *or* violations of environmental or land use rules, regulations, demands or orders of appropriate state or federal regulatory agencies." (Emphasis added).  An "Environmental Defect Amount" is defined as "the cost to remediate such Environmental Defect in accordance with applicable environmental laws." An "Environmental Defect" is not limited to pollution that violates the law.   An "Environmental Defect Amount" is the cost of remediating an "Environmental Defect" in accordance with applicable environmental laws.  The provision addresses the cost of performing the remediation work so that the work is "in accordance" with environmental laws.

11

Chaparral submitted evidence that the clean-up work WDMI and Galloway did was to remediate "environmental pollution or contamination, including pollution of the soil, ground water or the air; underground injection activities and waste disposal on site of offsite," and was covered by the PSA.  Morris testified in his deposition that the work included cleaning up an oil spill, repairing a saltwater leak, putting down absorbing material, and replacing contaminated dirt. Galloway testified that the work included cleaning up an oil spill.  (Docket Entry No. 33, Ex. B at 45-51, 80-81, Ex. C at 30-31, Ex. D at 3).  WDMI's and Galloway's argument that not all of the clean-up costs were spent on environment contamination is belied by their own characterization of all these costs as "relating to environmental clean-up."  (Docket Entry No. 33, Ex. B at 52-54; Ex. D at 3).

The parties did not, however, address one aspect of the PSA that may be important. The PSA bars post-closing purchase-price adjustments for "Environment Defects," not for "Environmental Defect Amounts."  (Docket Entry No. 32, Ex. A at 10-11).  This difference could support an interpretation that the PSA bars either party from seeking a post-closing price adjustment because of the presence of an unremediated "Environmental Defect," but does not bar any party from seeking a post-closing price adjustment for costs incurred before closing to remediate an "Environmental Defect."  The "Environmental Defects" provision provides the buyer an opportunity to investigate the property before closing and to refuse to close because "Environmental Defects" are present.  The provision does not require the seller to cure any Environmental Defects or to pay remediation costs.  The provision bars post-closing purchase-price adjustments for "Environmental Defects" present on the property but

12

allows the buyer the opportunity to investigate before closing and refuse to close if the remediation costs would exceed $1 and the buyer gave timely notice. The PSA clause stating that "no purchase price adjustments shall be made for Environmental Defects" prevents the buyer from declining to exercise its opt-out right under the PSA for environmental pollution and then seeking a post-closing price adjustment for the costs of remediating such pollution. The provision arguably does not, however, bar a seller from paying to remediate the "Environmental Defects" and then seeking reimbursement for the cost of remediation if these costs were covered by the provisions allowing post-closing price adjustments. Under this interpretation, this PSA section would not prevent the sellers from recovering their expenses for work to remediate Environmental Defects done after the effective date but before the closing date, if the expenses were otherwise recoverable under the PSA.

The parties did not brief the consequences of the fact that the PSA precludes post-closing purchase-price adjustments for the presence of "Environmental Defects" on the property, but does not preclude post-closing purchase-price adjustments for "Environmental Defect Amounts" spent on pre-closing remediation work. Because the parties did not brief this issue, the court is reluctant to rule on the parties' summary judgment motions without allowing an opportunity to do so.

That reluctance results from the presence of disputed fact issues that preclude summary judgment if the provision precluding post-closing price adjustments for "Environmental Defects" does not apply here. If that provision does not bar post-closing price adjustments for amounts paid before closing to remedy such Environmental Defects,

13

there is a genuine issue of material fact as to whether the parties orally agreed to have WDMI and Chaparral pay the clean-up costs, as Chaparral asserts.  And if the PSA does not bar post-closing price adjustments for amounts paid before closing for environmental clean-up work, WDMI and Galloway could only recover the amounts if they were paid under "applicable operating agreements."  There are disputed fact issues material to determining whether the expenses are recoverable under "applicable operating agreements," as WDMI and Galloway assert.

Chaparral alleges that before the PSA was signed, the parties orally agreed that WDMI and Galloway would do the clean-up work, at their own expense, as a condition precedent to Chaparral signing the PSA and proceeding to closing.  (Docket Entry No. 35 at 8; *Id.*, Ex. A at 11-12).  WDMI and Galloway dispute that such an agreement existed.  They also argue that, as a matter of law, any such agreement is unenforceable under the clause stating that the PSA  "may not be altered or amended, nor any rights hereunder be waived, except by an instrument in writing."  (Docket Entry No. 32 at 5; *id.*, Ex. A at 17).

A condition precedent may be either a condition to the initial formation of a contract or to an obligation to perform under an existing agreement. *See Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976); *Castroville Airport, Inc. v. City of Castroville*, 974 S.W.2d 207, 210 (Tex. App.-San Antonio 1998, no pet.); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 627 (Tex. App.-San Antonio 1996, writ denied). Extrinsic evidence is admissible to establish an oral agreement establishing a condition precedent if the oral agreement is consistent with the terms of the written agreement. *Wilson*

14

*& Wilson Tax Servs., Inc. v. Mohammed*, 131 S.W.3d 231, 238-39 (Tex. App.-Houston [14th Dist.] 2004, no pet.); *Castroville*, 974 S.W.2d at 210; *Litton v. Hanley*, 823 S.W.2d 428, 430-31 (Tex. App.-Houston [1st Dist.] 1992, no writ); *Rincones v. Windberg*, 705 S.W.2d 846, 847-848 (Tex. App.-Austin 1986, no writ). The party seeking to recover under a contract has the burden of proving that all conditions precedent have been satisfied. *Wilson*, 131 S.W.3d at 238; *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).

The amendment and alteration provision of the PSA would not make unenforceable an oral agreement that WDMI and Galloway would perform and pay for the environmental clean-up as a condition precedent to signing the PSA and proceeding to closing. Chaparral has presented evidence that it insisted on WDMI and Galloway performing and paying for the clean-up before Chaparral would agree to sign the PSA. Chaparral may introduce evidence of an oral agreement on the clean-up costs because the PSA is not fully integrated with respect to the question of which party would bear expenses for all work performed between the effective date and closing, despite the fact that the PSA contains an integration clause. An integration clause does not prohibit evidence showing prior or contemporaneous oral agreements if the contract, on its face, is not fully integrated. *See Bob Robertson, Inc. v. Webster*, 679 S.W.2d 683, 688-89 (Tex. App.-Houston [1st Dist.] 1984, no writ). A contract may be integrated with respect to some terms but not others. *Magnolia Warehouse & Storage Co. v. Davis & Blackwell*, 195 S.W. 184, 185 (Tex. 1917); *ADT §. Servs., Inc. v. Hawa*, No. 09-04-536 CV, 2005 WL 2878161, at *9 (Tex.-App.-Beaumont Nov. 3, 2005, no

pet.).  The PSA prohibits adjusting the purchase price for Environmental Defects but the PSA permits adjusting the purchase price by "[a]ny other amount agreed upon by Seller and Buyer."  On its face, the PSA was not fully integrated with respect to whether the parties agreed that WDMI and Galloway would bear certain expenses incurred between the effective date and the closing date.  *See Bob Robertson, Inc.*, 679 S.W.2d at 688-89.

There are disputed issues material to determining whether the  general price-adjustment provision of the PSA is unambiguous and requires Chaparral to reimburse WDMI and Galloway for clean-up work on the purchased property performed after the effective date but before the closing date.  (Docket Entry No. 32 at 3-5).  WDMI and Galloway argue that the provision "makes a very logical and sensible allocation of revenues and expenses" under which income and expenses before the effective date are allocated to the seller, while income and expenses after the effective date are allocated to the buyer.  (*Id.* at 4).  The PSA provides for an upward price adjustment in five circumstances.  Two could apply to the clean-up costs at issue.[2]

First, the PSA adjustment provision states that the purchase price will be adjusted upwards by the "amount of all verifiable expenditures under applicable operating agreements or other similar arrangements or agreements and, in the absence of such agreements, such expenses of the sort customarily billed thereunder, paid by Seller in connection with the Interests for the period subsequent to the Effective Time."  (Docket Entry No. 32, Ex. A at

---

[2]WDMI and Galloway do not claim that they are owed money for oil and gas, for prepaid expenses, or because the "Interests" are in "underproduced" status.

16

2-3).  WDMI and Galloway rely on this provision to seek reimbursement.  To fall under this adjustment clause, the clean-up costs must have been: (1) made under "applicable operating agreements"; (2) made under an arrangement or agreement "similar" to an "applicable operating agreement"; or (3) costs of the sort normally billed under an "applicable operating agreement."  This clause cannot be the basis for granting WDMI's and Galloway's summary judgment motion because, as they concede, the language is ambiguous.  It is unclear whether "applicable operating agreement"  has a broad meaning – an agreement relating to any work done on the property after the effective date and before closing – or a narrow meaning – an agreement to perform only work that is regularly and necessarily performed to operate the property.  (Docket Entry No. 32 at 6).  The phrases "other similar arrangements or agreements" and "costs of the sort normally billed under an applicable operating agreement" are similarly ambiguous because their meaning depends upon the meaning of the term "applicable operating agreement."  Whether the clean-up work at issue was done under "applicable operating agreements or other similar arrangements or agreements and, in the absence of such agreements, such expenses of the sort customarily billed thereunder" depends on whether "applicable operating agreement" is used in the broad or narrow sense.  Galloway stated in his affidavit that "[t]he clean-up activities are the types of activities that are carried on in the ordinary course of operating and maintaining oil and gas properties." (Docket Entry No. 32, Ex. A at 2).  However, in their depositions, both Dale Morris, president of WDMI, and Galloway testified that they believed the clean-up work was unnecessary and that they would not have performed it had Chaparral not insisted.  Morris

testified that "[m]y initial thought was, I mean, and to this day, there was no issue to start out with.  It was an esthetics deal with those guys, as far as I'm concerned, that we met our requirements and the Railroad Commission.  There was no need for any of that to be spent." (Docket Entry No. 33, Ex. B at 55).  When asked if he agreed that there were oil spills that "needed to be cleaned up," Galloway replied, "[n]eeded to be?  Needed by Chaparral or by the Railroad Commission and Temple Inland?"   Galloway agreed that there was "an environmental issue that Chaparral thought was important enough that they wanted it cleaned up before they would close."  (Docket Entry No. 33, Ex. C at 30–31).  If "operating agreement" is narrowly defined, according to Morris and Galloway the clean-up work would not have been performed under "applicable operating agreements or other similar arrangements or agreements" and would not have been expenses "of the sort customarily billed" under such agreements.  There is a genuine issue of disputed fact material to determining whether the clean-up costs were incurred under "applicable operating agreements or other similar arrangements or agreements and, in the absence of such agreements, such expenses of the sort customarily billed thereunder."

The second PSA price-adjustment provision that could apply states that the purchase price will be adjusted up or down by "any other amount agreed upon by Seller and Buyer." (Docket Entry No. 32, Ex. A at 3).  Neither party asserts that there was a separate agreement that the price would be adjusted upward to account for clean-up costs paid by WDMI and Chaparral.

In summary, although Chaparral has shown that it is owed $10,719.85, and that the clean-up costs WDMI and Galloway seek were "Environmental Defect Amounts" and that Chaparral gave timely notice of the defects that were remediated, the parties have not addressed whether the PSA allows post-closing price adjustments for "Environmental Defect Amounts" as opposed to unremediated "Environmental Defects." As a result, this court does not grant Chaparral's summary judgment motion at this time. There are genuine disputes as to whether there was an enforceable oral agreement for WDMI and Galloway to pay the clean-up costs and, if not, whether the costs were incurred under "applicable operating agreements" or in the absence of such agreements, are of a sort "customarily billed thereunder." These issues preclude granting WDMI's and Galloway's summary judgment motion.

## IV. The Issue of Attorneys' Fees

"State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). A plaintiff is entitled to recover reasonable attorneys' fees for a suit for breach of contract under Texas Civil Practice and Remedies Code § 38.001(8).[3] A plaintiff seeking attorneys' fees under section 38.001 has the burden of demonstrating the reasonableness and necessity of the fees and to segregate recoverable fees from unrecoverable fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991); *In re Smith*, 966 F.2d 973, 978 (5th Cir.

---

[3]Section 38.001 provides: "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . (8) an oral or written contract."

19

1992) (citing *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex. App.–Houston [14th Dist.] 1986, writ ref'd n.r.e.).  When a plaintiff seeks to recover attorneys' fees in a case involving multiple claims, at least one of which supports an award of fees and at least one of which does not, the plaintiff must offer evidence segregating the fees among the various claims. *Lesikar v. Rappeport*, 33 S.W.3d 282, 317 (Tex. App.–Texarkana 2000, pet. denied); *In re Smith*, 966 F.2d at 978.  A failure to segregate fees in a case containing multiple causes of action, only some of which permit the recovery of fees, can defeat a fee recovery, *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997), or lead a court to reduce the amount of the fee award if the documentation is vague or incomplete,  *See La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995)*.*  There is an exception to the duty to segregate when the attorneys' fees are in connection with claims arising out of the same transaction and are so interrelated that their prosecution entails proof of essentially the same facts. *Sterling*, 822 S.W.2d at 11.

Both the Fifth Circuit and the Texas courts use the lodestar method for calculating reasonable attorneys' fees.  *See Kellstrom*, 50 F.3d at 324.; *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 782 (Tex. App.-Fort Worth 2005, pet. granted, judgm't vacated w.r.m.); *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 684 (Tex. App.-Fort Worth, 1998, pet. denied); *see also Guilty v. C.C.I. Enters., Co.*, 54 S.W.3d 526, 528 (Tex. App.-Houston [1st Dist.] 2001, no pet.) ("In determining the reasonableness of attorney's fees, the fact finder must be guided by a specific standard.  This standard is substantially similar under both federal law and state law.").  One step of this analysis is to determine the

reasonable hourly rate for the attorneys and nonlegal personnel who worked on the case.  The

reasonable hourly rate is "based on the prevailing market rates in the relevant community."

*Blum v. Stenson*, 465 U.S. 886, 895 (1984).  A court must also determine the number of hours

"reasonably expended" by the attorneys.  *Kellstrom*, 50 F.3d at 324.  The court then

multiplies the hours "reasonably expended" by the reasonable hourly rate to determine the

lodestar figure.  *Id.*  The burden of demonstrating the reasonableness of the number of hours

expended and the hourly rates charged falls on the fee applicant.[4]  *Id.*

Chaparral was unsuccessful on its damages claim relating to the saltwater disposal

well.  Even if Chaparral prevails as to its claim that it is entitled to recover $10,709.85 in

post-closing adjustments that is not offset by an obligation to reimburse WDMI and

Galloway for pre-closing clean-up costs, Chaparral may only recover fees for the claim on

which it prevailed.  *See McAnelly v. Brady Med. Clinic, P.A.*, No. 03-04-00095-CV, 2004

WL 2556634, at *4 (Tex. App.-Austin Nov. 12, 2004, no pet.) (finding that the plaintiff's

attorneys' fees were capable of being segregated by claim and that the plaintiff was only

entitled to those fees attributable to the one successful claim); *Gorman v. Countrywood Prop.

Owners Ass'n*, 1 S.W.3d 915, 919 (Tex. App. – Beaumont 1999, pet. denied) (holding that

---

[4]The court may increase or decrease the lodestar amount based on the factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974). The twelve *Johnson* factors are:  (1) the time and labor involved, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to this case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations, (8) the amount involved and results obtained, (9) the experience, reputation, and ability of counsel, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.  Texas courts weigh similar factors set out in Rule 104 of the Rules of Professional Conduct to determine the reasonableness of fees. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

the plaintiff properly segregated attorneys' fees attributable to successful claims from attorneys' fees attributable to unsuccessful claims.

Chaparral has submitted two affidavits by one of its lawyers, Paul F. Simpson. The affidavits and attached documents segregate the fees attributable to the claim on which Chaparral prevailed from the claim on which it did not. Time spent solely on the unsuccessful claim is not included in Chaparral's fee request. In the affidavits, Simpson states that only a percentage of the time spent on tasks that applied to both claims is included. Of 390 hours total spent on this case, Chaparral requests fees for 250 hours.

WDMI and Galloway argue that the number of hours spent on the case is excessive because the amount on which Chaparral might prevail is so small. WDMI and Galloway also argue that the lodestar should be reduced because of the relatively small amount involved in the only claim on which Chaparral might prevail. *See Johnson*, 488 F.2d at 718. Under Texas law, a trial court may consider whether the attorneys' fees requested are excessive compared to the amount owed in determining an appropriate fee award. *See Sibley v. RMA Partners, L.P.*, 138 S.W.3d 455, 459 (Tex. App.-Beaumont 2004, no pet.). "The attorneys' fees must bear some reasonable proportion to the amount involved." *USX Corp. v. Union Pac. Res. Co.*, 753 S.W.2d 845, 858 (Tex. App.-Fort Worth 1988, no pet.). However, Texas law does not require precise proportionality between the amount of recovery and the fees awarded. *See Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988) (awarding $12,570 fee on a recovery of $2,920 in a contract suit); *Sibley*, 138 S.W.3d at 458-59 (awarding $82,748 fee on a recovery of approximately $43,000 in a contract suit); *Flint*

*& Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 626 (Tex. App.-Dallas 1987, writ denied) (approving $162,000 fee on a recovery of $24,067.14 in a contract suit).

The federal courts have primarily considered the issue of disproportionate attorneys' fees in the context of fee-shifting statutes such as 42 U.S.C § 1988 and ERISA. *See, e.g. City of Riverside v. Rivera*, 477 U.S. 561(1986) (§ 1988); *United Auto. Workers Local 259 Soc. §. Dep't v. Metro Auto Center*, 501 F.3d 283 (3d Cir. 2007) (ERISA).[5] The Fifth Circuit has held that the "amount of damages awarded is one factor to be considered in setting the amount of attorney's fees," but that the "district court must also carefully consider any other relevant *Johnson* factors" and "should not reduce the fee award solely because of a low damages award." *Cobb v. Miller*, 818 F.2d 1227, 1235 (5th Cir. 1987); *see also West v. Nabors Drilling USA, Inc*., 330 F.3d 379, 395 (5th Cir. 2003) (stating that there is no requirement that an attorneys' fee award be proportional to a damage award under a federal

---

[5]A four-Justice plurality of the Supreme Court in *City of Riverside v. Rivera* refused to adopt a "rule of proportionality" for 42 U.S.C. § 1988 fees because such a rule "would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts" and would undermine "Congress' purpose in enacting § 1988." *City of Riverside*, 477 U.S. at 578 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ.). Justice Powell cast the fifth vote to affirm the fee award of $245,456.25 for a case in which plaintiffs were awarded $33,350 in damages. *Id*. at 581-86 (Powell, J., concurring in judgment). In the margin of his concurring opinion, Justice Powell stated, "[i]t probably will be the rare case in which an award of private damages can be said to benefit the public interest to an extent that would justify the disproportionality between damages and fees reflected in this case." *Id*. at 586 n. 3. The courts have divided over this suggestion that generally only proportionate fees should be awarded and that the public interest served by the underlying case should be considered before awarding disproportionate fees. *See, e.g., Moriarty v. Svec*, 233 F.3d 955, 967-68 (7th Cir. 2000) (relying on Justice Powell's concurrence to support the proposition that "proportionality concerns are a factor in determining what a reasonable fee is"); *Cunningham v. City of McKeesport*, 807 F.2d 49, 53-54 (3d Cir.1986) (refusing to adopt a "rule of proportionality" or "consider the extent to which the public interest was vindicated by the award if the fee sought is disproportionate to the damages awarded"); *Northeast Women's Center v. McMonagle*, 889 F.2d 466, 458 (3d Cir. 1989)(refusing to apply proportionality to fee award under RICO, 18 U.S.C. §§ 1961-68); *Metro Auto Center*, 501 F.3d at 292-96 (refusing to require proportionality in ERISA context).

civil rights statute, but that proportionality is a relevant consideration); *Hollowell v. Orleans Regional Hosp. L.L.C.*, 217 F.3d 379, 392 (5th Cir. 2000) (stating that "while a low damages award is one factor which a district court may consider in setting the amount of attorney's fees, this factor alone should not lead the district court to reduce a fee award").

The number of hours Chaparral has already spent and attributed to the remaining claim is significantly larger than the amount of post-closing price adjustments Chaparral seeks to recover. That alone does not require finding either that the amount of work performed was excessive – as long as there was no unnecessary or duplicative work – or that the lodestar should be reduced, but it is a factor to be considered in determining whether the fees sought are reasonable. The fact that counsel for WDMI and Galloway spent fewer hours defending the entire case than Chaparral's counsel did prosecuting the claim on which it hopes to recover and thereby recover fees does not make the number of hours spent by Chaparral's counsel excessive. *See Ferrand v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (stating that "opposing parties do not always have the same responsibilities under the applicable rules, nor are they necessarily similarly situated with respect to their access to necessary facts, the need to do original legal research to make out their case, and so on," and noting that a court should consider "the possibility that the prevailing party's attorney – who, after all, did prevail – spent more time because she did better work").

Because the breach of contract claim is not decided, the fee issue is not ready for decision. This section is included because the parties made clear their disagreement on the law that would apply.

24

## V.    Conclusion

WDMI's and Galloway's motion for summary judgment is denied.  Chaparral's cross-motion for summary judgment is denied.

SIGNED on January 22, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

25