**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CHAPARRAL TEXAS, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2468 |
| | § | |
| W. DALE MORRIS, INC., *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This suit stems from a contract to purchase oil and gas wells, leases, and properties located in Texas.  The plaintiff, Chaparral Texas, L.P., was the purchaser; the defendants, W. Dale Morris, Inc. ("WDMI") and Paul R. Galloway, Jr., were the sellers.   In this suit, Chaparral asserted two separate breach of contract claims.  First, Chaparral alleged that a saltwater disposal well included in the sale was completed in violation of a Texas Railroad Commission permit, breaching the contract.  Chaparral sought approximately $150,000 in damages for this alleged contract breach.  Second, Chaparral alleged that it was entitled to recover approximately $12,000 in postclosing price adjustments and alleged that WDMI's and Galloway's refusal to pay breached the contract.  WDMI and Galloway counterclaimed seeking $16,710 in reimbursement for amounts spent on preclosing cleanup work on the property sold.

This court granted WDMI's and Galloway's motion for summary judgment that the condition of the saltwater disposal well did not breach the contract.  (Docket Entry No. 25).

This court denied both parties' motions for summary judgment on the issue of whether the purchase price should have been adjusted to account for certain expenses the parties incurred before the closing date.  In their cross-motions, the parties did not fully address a provision in the purchase contract barring postclosing purchase-price adjustments for "Environment Defects."  (Docket Entry No. 42 at 12–14).  This court held that if that provision did not bar postclosing price adjustments for amounts paid before closing to remedy such "Environmental Defects," summary judgment could not be granted because there were disputed fact issues material to determining whether the amounts sought were due.

Chaparral has filed a supplemental motion for summary judgment addressing the unresolved issue of whether the contract bars the amount WDMI and Galloway seek as a postclosing price adjustment.  (Docket Entry No. 45).  WDMI and Galloway responded, (Docket Entry No. 48), and Chaparral replied, (Docket Entry No. 49).  Based on the pleadings, the motion, response, and reply, the parties' submissions, and the applicable law, this court grants Chaparral's supplemental motion for summary judgment and enters final judgment.  The reasons for this ruling are explained in detail below.

## I.    Background

### A.    The Parties' Contract

The parties entered into a Purchase and Sale Agreement ("PSA") under which Chaparral acquired from WDMI and Galloway oil and gas wells, leases, and other property – referred to collectively in the PSA as the "Interests" – located in Texas.  The PSA had an effective date of June 1, 2004, was signed on July 27, 2004, and closed on August 4, 2004.

(Docket Entry No. 32, Ex. A at 1, 2, 13).  For the period between the effective date and the closing date, section 4.01(b) of the PSA required WDMI and Galloway to "operate [their] business in the ordinary course" and to obtain Chaparral's prior written consent before "commit[ting] to any operation, or services of related operations" or making "any capital expenditures" that exceeded $5,000.  (*Id.*, Ex. A at 7, PSA § 4.01(b)).  Section 2.02 of the PSA provided that the $2,029,458.00 purchase price would be adjusted for certain expenses incurred and revenues received between the effective date and the closing date, while the transaction was being completed.  The purchase price would be increased by:

> (i) The value of all oil and gas in storage or pipelines at the Effective Time above the pipeline connection or upstream of the sales meter which is credited to the Interests, such value to be the market value or, if applicable, the contract price in effect as of the Effective Time, less taxes and deductions by the purchaser;

> (ii) The amount of all verifiable expenditures under applicable operating agreements or other similar arrangements or agreements and, in the absence of such agreements, such expenses of the sort customarily billed thereunder, paid by Seller in connection with the Interests for the period subsequent to the Effective Time;

> (iii) An amount equal to all prepaid expenses attributable to the Interests that are paid by Seller or any affiliate of Seller prior to the Closing Date . . . that inure to the benefit of Buyer and that are, in accordance with generally accepted accounting principles, attributable to the period after the Effective Time, including without limitation, prepaid ad valorem, property, production, severance and similar taxes (but not including income taxes) based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom;

> (iv) Any other amount agreed upon by Seller and Buyer.

3

(Docket Entry No. 32, Ex. A at 2–3, PSA § 2.02).  The purchase price would be decreased

by:

> (i) The value of proceeds received by Seller from the sale of oil, gas or other hydrocarbons attributable to the Interests and relating to production after the Effective Time, less all applicable taxes not reimbursed to Seller by a purchaser;

> (ii) An amount equal to Seller's pro rata share of any unpaid ad valorem, property, production, severance and similar taxes and assessments (but not including income taxes) based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom accruing to the Interests prior to the Effective Time;

> (iii) The amount of all verifiable expenditures paid by Buyer for work actually done and performed in connection with the Interests for the period prior to the Effective Time;

> (iv) Any other amount agreed upon by Seller and Buyer;

> (v) The amount of the deposit as per execution of this Agreement as set forth in Section 2.01 (a).

(*Id.*).

Section 5.07 of the PSA addressed "Environmental Procedure."  It stated:

(a) Prior to the Closing Date, Buyer may conduct a field inspection of the Interests and Buyer may further secure, at its sole risk, cost and expense, an environment audit of all or any of the Interests.  At Buyer's request, Seller will make arrangements with the operator of the Interests for Buyer, or Buyer's representatives, to conduct the inspection or audit.  If obtained, Buyer shall immediately furnish a copy of such environmental audit to Seller and the contents of such environmental audit shall remain confidential unless required to be disclosed by any rule, order or governmental proceeding.

(b) As used herein, Environmental Defect shall mean any material environmental defect relating to the Interests in the nature of environmental pollution or contamination, including pollution of the soil, ground water or the air; underground injection activities and waste disposal on site or offsite;

4

failure to comply with applicable land use, surface disturbance, licensing or notification requirements; or violations of environmental or land use rules, regulations, demands or orders of appropriate state or federal regulatory agencies.

(c) As used herein, Environmental Defect Amount means the cost to remediate such Environmental Defect in accordance with applicable environmental laws. Notwithstanding the foregoing, no Purchase Price adjustments shall be made for Environmental Defects but either Seller or Buyer may terminate this Agreement as provided in Section 5.07(e) below.  Additionally, Seller is under no obligation to cure any Environmental Defect asserted by Buyer.

(d) If Buyer discovers any Environmental Defect, Buyer shall give Seller notice of such Environmental Defect no later than two (2) days prior to the Closing Date.  Such notice shall be in writing and shall include (I) a description of the Environmental Defect and (ii) the Environmental Defect Amount therefor.  Buyer shall be deemed to have waived all Environmental Defects to which Buyer has not given timely notice to Seller thereof.

(e) Notwithstanding any terms contained in this Agreement to the contrary, in the event the aggregate amount of the Title Defects set forth in Section 5.05 above and the Environmental Defects which Buyer timely asserts exceeds $1.00, either Seller or Buyer may elect to terminate this Agreement.

(Docket Entry No. 32, Ex. A at 10–11, PSA § 5.07).

Under the PSA, Chaparral had the right to inspect the property for "Environmental Defects" before the closing date.  Chaparral was required to give WDMI and Galloway notice of any such defects no later than two days before the closing date.  The PSA required this notice to be in writing, to include a description of the "Environmental Defects," and to state the "Environmental Defect Amount," defined as "the cost to remediate such Environmental Defect in accordance with applicable environmental laws."  (*Id.*, PSA § 5.07(c)).  The PSA did not require WDMI and Galloway to cure any "Environmental Defects" Chaparral identified.  Rather, the PSA stated that either Chaparral or WDMI and

5

Galloway could terminate the Agreement if "the Environmental Defects which Buyer timely asserts" had even a *de minimis* impact.  (*Id.*, PSA § 5.07(e)).  The PSA also stated that Chaparral "shall be deemed to have waived all Environmental Defects" for which timely notice was not given.  (*Id.*, PSA § 5.07(d)).

The PSA included a choice-of-law provision specifying Texas law.  (Docket Entry No. 32, Ex. A at 18, PSA § 10.10).

### B.      The Postclosing Price-Adjustment Claims

Before signing the PSA, Chaparral inspected the property.  After the inspection, Chaparral met with WDMI and Galloway and gave them a written list of environmental problems.  (Docket Entry No. 33, Ex. B at 23-27, 42-43).  Chaparral told WDMI and Galloway that these problems had to be remedied before Chaparral would purchase the property.  Chaparral had received a $200,000 bid for the cleanup work.  (*Id.*, Ex. B at 43; Ex. C at 30–31).  WDMI and Galloway refused to reduce the sale price by $200,000 and told Chaparral that they could do the cleanup work for significantly less.  The parties agreed that WDMI and Galloway would arrange for the cleanup work and that the sale price would not be reduced by $200,000.  (*Id.*, Ex. B at 44).

WDMI and Galloway paid $16,710 for cleanup work on the property.  The work was performed after the PSA's effective date but before the closing date.  (Docket Entry No. 32, Exs. A, C, D).  The work included cleaning up oil and salt water, washing tanks and well heads, replacing "old dirt," and placing absorbent material such as peat moss on the ground.  (Docket Entry No. 32 at 7; *Id.*, Ex. C; Docket Entry No. 33, Ex. B at 47-51, 80-81).

After Chaparral filed suit and the parties had conducted discovery and filed their dispositive motions, WDMI and Galloway agreed that they owed Chaparral approximately $10,000 in postclosing price adjustments.  WDMI and Galloway argued that this amount was more than offset by Chaparral's obligation to reimburse them for the $16,710 they had spent on environmental cleanup costs.

This court held that the cleanup work WDMI and Galloway did was to remediate environmental contamination and that Chaparral was not required to provide notice of "environmental defects" before the PSA closing in order to recover price adjustments for Environmental Defects, and that in any event Chaparral did give notice, in writing, of the environmental problems it identified.  Because the parties did not address the fact that section 5.07(c) of the PSA bars postclosing purchase-price adjustments for "Environment Defects," not for "Environmental Defect Amounts," summary judgment was not granted on the cross-motions raising the issue of whether the PSA precluded a postclosing price adjustment for the amount spent to remediate "Environmental Defects" before closing.  (Docket Entry No. 42 at 10–13).  This court noted that if the provision precluding postclosing price adjustments for "Environmental Defects" did not bar postclosing price adjustments for amounts paid before closing to remedy such Environmental Defects,  there would be disputed fact issues that preclude summary judgment.  Those fact issues included whether there was an enforceable oral agreement for WDMI and Galloway to pay certain cleanup expenses and, if not, whether the general price-adjustment provision in the purchase contract required Chaparral to reimburse WDMI and Galloway for the cleanup work on the purchased property

7

performed after the effective date but before the closing date because the cleanup expenses were incurred under "applicable operating agreements" or, in the absence of such agreements, were of a sort "customarily billed thereunder." (Docket Entry No. 42 at 13–19).

The issue raised by the pending motions is whether the provision precluding postclosing price adjustments for "Environmental Defects" bars a postclosing price increase for the $16,710 the sellers paid before closing to address environmental problems timely identified by Chaparral.

## II.    The Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim.  *Celotex*, 477 U.S. at 330.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could

8

affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary  judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations.  The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

What a contract means, and whether a contract is ambiguous, are questions of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).  A court should construe an unambiguous contract according to the plain meaning of its express wording. *Lyons v. Montgomery*, 701

9

S.W.2d 641, 643 (Tex. 1985).  Unambiguous contracts are enforced as written.  *Heritage*, 939 S.W.2d at 121.

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.  *Id.*   A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract.   *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).  Parol evidence is not admissible for the purpose of creating an ambiguity. *See Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951); *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (1941).  If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain the true meaning of the instrument.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

## III.   Analysis

In this court's previous memorandum and opinion addressing the parties' dispute over the contractually required purchase-price adjustments, this court held that Chaparral had shown that the cleanup costs WDMI and Galloway seek as reimbursement were "Environmental Defect Amounts" and that Chaparral gave timely notice of the environmental defects that were cleaned up at WDMI's and Galloway's expense.  In their briefs, the parties did not address the fact that section 5.07(c) of  the PSA bars post-closing purchase-price adjustments for "Environment Defects" but not for "Environmental Defect Amounts." (Docket Entry No. 32, Ex. A at 10–11).

10

Chaparral argues that "[t]he plain meaning of [the phrase 'no purchase price adjustments shall be made for Environmental Defects'] is that neither party can recover for costs incurred as a result of such Environmental Defects, which they *could* seek in the absence of that provision.  While the clause uses the phrase 'Environmental Defects' instead of 'Environmental Defect Amounts,' the result is the same: no Purchase Price adjustments arising from such Defects are allowed, regardless of when incurred, and whether remediated or not." (Docket Entry No. 45 at 4).  Chaparral argues that interpreting the "no purchase price adjustments . . . for Environmental Defects" clause as addressing purchase-price adjustments only for unremediated environmental defects that remain on the property, and not the expenses incurred in remedying environmental defects before closing, would bar only downward price adjustments.  According to Chaparral, such an interpretation "creates surplusage and is thus not reasonable" because the PSA also stated that WDMI and Galloway had no obligation to cure any Environmental Defects in the first place.  (*Id.* at 7).  Chaparral also argues that interpreting the "no purchase price adjustments . . . for Environmental Defects" clause as addressing purchase-price adjustments only for the presence of unremediated environmental defects on the property would make the clause superfluous and meaningless because "even absent the provision at issue, Buyer is *already* not entitled to such a downward Purchase Price adjustment for an unremediated defect." (*Id.* at 4–6).  Chaparral argues that this interpretation would rewrite the PSA, which must be construed in favor of Chaparral because it did not draft the document.  (*Id.* at 7–9).

11

WDMI and Galloway argue that "the mere fact that WDMI and Galloway arranged for the clean-up, standing alone, does not mean that WDMI and Galloway were obligated to pay for the clean up, unless WDMI and Galloway agreed to do so," because they were "under no obligation to cure any Environmental Defect asserted by Buyer." (Docket Entry No. 48 at 3). WDMI and Galloway argue that "[t]here is a fact issue as to whether WDMI and Galloway made an agreement to 'cure' the environmental defects asserted by Chaparral or whether WDMI and Galloway simply agreed to arrange for the cure of the environmental defects asserted by Chaparral, but at Chaparral's expense." (*Id.*). WDMI and Galloway also argue that "[i]t is quite possible that the issue of who would bear the cost of environmental clean-up was simply never addressed by the parties and is not addressed anywhere in the agreement." (*Id.* at 4).

Contrary to WDMI's and Galloway's argument, the PSA does address the cost of environmental cleanups. Section 5.07(c) of the PSA states:

> As used herein, Environmental Defect Amount means the cost to remediate such Environmental Defect in accordance with applicable environmental laws. Notwithstanding the foregoing, no Purchase Price adjustments shall be made for Environmental Defects but either Seller or Buyer may terminate this Agreement as provided in Section 5.07(e) below. Additionally, Seller is under no obligation to cure any Environmental Defect asserted by Buyer.

(Docket Entry No. 32, Ex. A at 11). Section 5.07(e) states:

> Notwithstanding any terms contained in this Agreement to the contrary, in the event the aggregate amount of the Title Defects set forth in Section 5.05 above and the Environmental Defects which Buyer timely asserts exceeds $1.00, either Seller or Buyer may elect to terminate this Agreement.

(Docket Entry No. 32, Ex. A at 11).

The "Environmental Defects" provision gives the buyer an opportunity to investigate the property before closing and to refuse to close if "Environmental Defects" are present. The provision does not require the seller to remediate any Environmental Defects or to pay any "Environmental Defect Amount" for remediation. The term bars postclosing purchase-price adjustments for "Environmental Defects" present on the property but allows the buyer to investigate before closing and to refuse to close if the buyer gives timely notice of the defects. Section 5.07(c), stating that "no purchase price adjustments shall be made for Environmental Defects," prevents the buyer from proceeding to closing despite the presence of an "Environmental Defect" and then seeking a postclosing price adjustment for any negative effects of that Environmental Defect. Although section 5.07(c) states that "no purchase price adjustments shall be made for Environmental Defects," rather than "no purchase price adjustments shall be made for Environmental Defect Amounts," this difference does not permit the seller to obtain reimbursement of amounts paid to remediate a timely identified Environmental Defect after the effective date but before closing, through a postclosing price adjustment.

This court finds that the "no Purchase Price adjustments . . . for Environmental Defects" clause bars postclosing purchase-price adjustments for any effects of timely identified environmental defects on the property, including any amounts spent to remediate Environmental Defects. The effects could be a decline in property value, not merely the costs to remediate. Although the "no Purchase Price adjustments . . . for Environmental Defects" clause uses the defined term "Environmental Defect" instead of the defined term

13

"Environmental Defect Amount," this difference does not support interpreting the clause as precluding postclosing purchase-price adjustments for the presence of unremediated Environmental Defects on the property, but not precluding postclosing purchase-price adjustments for costs spent on remediating Environmental Defects after the effective date but before closing.  This result is supported by the fact that the definition of Environmental Defect Amount" as the cost to remediate the defect is immediately followed by the clause, "[n]otwithstanding the foregoing, no Purchase Price adjustments shall be made for Environmental Defects but either Seller or Buyer may terminate this Agreement as provided in Section 5.07(e) below."  Section 5.07(e) states that even if the costs are *de minimis*, the parties have the right to refuse to close as the *only* remedy for a timely asserted Environmental Defect.  The final sentence in section 5.07(c), "[a]dditionally, Seller is under no obligation to cure any Environmental Defects asserted by Buyer," makes clear that regardless of how large or small the remediation costs may be, the seller has no obligation to spend that sum and the buyer no obligation to accept the property.[1]

---

[1]The PSA also included a provision addressing "Title Procedure," which closely paralleled the "Environmental Procedure" provision.  The "Title Procedure" provision stated:

(a) As used herein, Title Defect Amount means an amount determined by evaluating the portion of the Interests affected by such Title Defect, the legal effect of the Title Defect, and the potential economic effect of the Title Defect over the life of the Interest affected. Notwithstanding the foregoing, no purchase price adjustments shall be made for Title Defects but either Seller or Buyer may terminate this Agreement as provided in Section 5.05(c) below.  Additionally, Seller is under no obligation to cure any Title Defect asserted by Buyer.

(b) If Buyer discovers any Title Defect, Buyer shall give Seller notice of such Title Defect no later than two (2) days prior to the Closing Date.  Such notice shall be in writing and shall include (I) a description of the Title Defect and (ii) the Title Defect Amount therefor.  Buyer shall be deemed to have waived all Title Defects to which Buyer has not given timely notice to Seller thereof.

14

WDMI and Galloway are barred from recovering the expenses they incurred to remediate the environmental contamination on the property through a postclosing price adjustment. WDMI and Galloway were not required by the PSA to remediate any Environmental Defects, but once they elected to pay for the remediation without obtaining a preclosing agreement on any price difference, they were barred from seeking a postclosing price adjustment for the amount paid for the remediation work. WDMI and Galloway assert that they did not agree to pay for the remediation work and that they "only paid the costs because Chaparral refused and WDMI and Galloway needed to avoid ruining their credit standing in the oil and gas industry in the area where the wells were located" and "did not wish to gain a reputation for failing to pay their bills." (Docket Entry No. 48 at 2). This argument ignores the fact that the PSA gave WDMI and Galloway the option to refuse to close rather than incur costs that the buyer was not obligated to pay. The PSA bars WDMi and Galloway from seeking a postclosing price adjustment for the amounts they paid to remediate Environmental Defects.

## IV.   Conclusion

Chaparral's motion for summary judgment that it is entitled to recover $10,709.85 in postclosing price adjustments with no offsetting obligation is granted. Final judgment is

---

(c)Notwithstanding any terms contained in this Agreement to the contrary, in the event the aggregate amount of the Title Defects and the Environmental Defects set forth in Section 5.07 hereinbelow which Buyer timely asserts exceeds $1.00, either Seller or Buyer may elect to terminate this Agreement.

(Docket Entry No. 32, Ex. A at 9–10, PSA § 5.05). As with the "Environmental Procedure" provision, under the "Title Procedure" provision the parties have the right to refuse to close as the *only* remedy for a timely asserted Defect, and the seller has no obligation to remediate a Defect.

15

entered by separate order.  Under Rule 54(d) of the Federal Rules of Civil Procedure,

Chaparral may move for attorneys' fees and costs within 14 days after judgment is entered,

submitting appropriate support for the amounts sought.

      SIGNED on August 28, 2008, at Houston, Texas.

                                          Lee H. Rosenthal
                            United States District Judge